LANAHAN et al. v. CLARK CAR CO. et al.

(Circuit Court of Appeals, Third Circuit. February 11, 1926. Application for Modification of Mandate Denied April 14, 1926.)

No. 3398.

**1. Patents ⚖══213—Instrument giving possession and right to use patent rights and inventions, together with business and assets of corporation, to inventor, who had sold patents and inventions to corporation, held not assignable.**

Instrument giving possession and right to use patent rights and inventions, together with all business and assets of corporation, to inventor, which rights and inventions he had prior thereto sold to corporation, but leaving title in corporation, and instrument being limited to presently owned and prospectively acquired patents, *held* personal to inventor, and not assignable.

**2. Principal and agent ⚖══97.**

General powers in power of attorney are limited by specific powers therein granted.

**3. Principal and agent ⚖══103(8)—Power to dispose of business is not implied from power to conduct it.**

In a power to conduct business, there is no implication of power to dispose of it, particularly where such power is found among the general powers.

**4. Principal and agent ⚖══103(8)—General power to conduct business, as limited by specific powers, held not to authorize sale of business by attorney in fact.**

General power to conduct business, as limited by specific powers and clearly relating to continuance of business, *held* too narrow to authorize sale of business by attorney in fact.

**5. Appeal and error ⚖══843(2)—Whether principal's mental incapacity revoked power of attorney is moot question, where power did not authorize sale made by attorney in fact.**

Whether mental incapacity of principal worked revocation of power of attorney is moot question, in view of finding that power granted was limited, and did not authorize sale made by attorney in fact.

**6. Principal and agent ⚖══161(6)—Attorney in fact, selling business of principal to creditor, held not guilty of fraud with creditor, in view of good bargain made for principal, as respects creditor's right to compensation on setting conveyance aside.**

Where attorney in fact conveyed principal's business to creditor, which in fact was a profitable bargain for principal, notwithstanding that creditor also made good bargain, *held*, that there was no fraud on part of creditor or attorney in fact, as respects creditor's right to compensation on setting conveyance aside.

**7. Principal and agent ⚖══170(3)—Principal, waiting from January to following July before protesting conveyance made by attorney in fact during time of principal's mental incapacity, did not waive his rights and impliedly ratify conveyance.**

Principal, who waited from January to following July before protesting conveyance made by attorney in fact during time of principal's mental incompetency, during which period he had gradually been regaining his mental faculties, did not waive his rights, so as to ratify what had been done.

**8. Corporations ⚖══410—Conditional ratification by directors of corporation of sale of its entire business is not ratification by stockholders, and does not bind corporation.**

Conditional ratification by directors of corporation of a sale of its entire business, though directors be substantial stockholders, is not ratification by stockholders, and does not bind the corporation.

**9. Principal and agent** ⬅161(6)—**Creditor, who after purchase from attorney in fact had placed principal's business on its feet, will be allowed compensation for services, on sale being set aside.**

Where conveyance made by attorney in fact to creditor of principal is set aside, creditor, who had succeeded in putting principal's business on its feet, will be allowed reasonable compensation for his services.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Frederic P. Schoonmaker, Judge.

Action by the Clark Car Company, a corporation of New Jersey, against the Clark Car Company, a corporation of Pennsylvania, Frank J. Lanahan, and Charles H. Clark, wherein defendant Clark filed a counterclaim in the nature of a cross bill against the other defendants. From a decree for plaintiff and defendant last named (11 F. [2d] 814), the other defendants appeal. Decree modified, and, as modified, affirmed.

Weller, Wicks & Wallace, of Pittsburgh, Pa., and Owen J. Roberts, of Philadelphia, Pa., for appellants.

Day & Day and William L. Day, all of Cleveland, Ohio, and Arthur O. Fording, of Pittsburgh, Pa., for appellee Clark Car Co.

Francis A. Wolf, Albert C. Hirsch, and John M. Freeman, all of Pittsburgh, Pa. (Watson & Freeman, of Pittsburgh, Pa., of counsel), for appellee Clark.

Before WOOLLEY and DAVIS, Circuit Judges, and MORRIS, District Judge.

WOOLLEY, Circuit Judge. This appeal is from a decree entered against the Clark Car Company, a Pennsylvania corporation, and Frank J. Lanahan for an accounting to the Clark Car Company, a New Jersey corporation, and to Charles H. Clark, also for the restitution of certain properties and the cancellation of certain instruments purporting to authorize their conveyance. In order that the questions of law and fact involved in the case and resolved in the decree may be understood, it is necessary first to state the facts out of which they arose. These are many and they are highly involved. We shall neither state nor discuss them at length but shall give in outline only enough to show the matters to which our judgment is directed, relying on the opinion and decree of the trial court for their disclosure in detail.

Clark was an inventor of improvements in railway dump cars. In 1908, he and others entered into a contract whereby they engaged to organize a corporation for the exploitation of his inventions and wherein Clark agreed that in consideration of forty per cent. of its stock he would sell and assign to the proposed corporation all patents he then owned and thereafter should acquire. Pursuant to this contract the Clark Car Company was organized under the laws of New Jersey and embarked on the enterprise. Meeting with feeble success, the New Jersey Company, in 1915, entered into a contract with Clark, naming him as lessee and itself as lessor, whereby, in terms, it "leased" to him all property incident to its business which it then owned and thereafter should acquire, including patents, upon annual "rentals" payable to its stockholders in the form of dividends of three per cent. on the outstanding capital stock of the corporation and twenty per cent. of Clark's gross earnings reckoned after an allowance of $20,000 for operating expenses, the term of the lease to be co-extensive with the terms of the patents which the corporation then owned and might acquire.

Clark, operating under the name of Clark Car Company, conducted the business as his own, so much so that he commingled its returns with returns from his other ventures, though he regularly paid the stipulated rentals. He did not build cars embodying his inventions but contracted for the manufacture of parts and their assembly into cars by steel manufactories. These concerns retained title in the cars until Clark had paid for them through a sort of trust arrangement with a trust company. As payments were made title was transferred, the cars released and sold by Clark at not less than a base price previously agreed upon with the fabricators. The war being on, Clark made money; with the end of the war the situation changed. In the year 1920 he had sold all cars made under previous contracts and was confronted with the problem whether he should contract for more or stop business. He solved the problem by contracting with the Cambria Steel Company and Westinghouse Air Brake Company for 250 cars to be built by them and sold by him on the market at a named price before February 10, 1921, title and possession, as theretofore, to remain in the builders until released by payment. In addition to obligations of this character, Clark incurred heavy indebtedness to other concerns which had no title in or lien upon the cars, nor had they any other security for their claims. Among these was the Fort Pitt Malleable Iron Company of which Frank J. Lanahan, one of the defendants, was president. This corporation was

Clark's largest unsecured creditor. He owed it $50,000 on promissory notes and more than $8,000 on open account. Moreover, it had manufactured castings of special design for an anticipated additional order of cars. The cost of these castings amounted to about $70,-000. This last amount was not immediately payable but it nevertheless was an obligation of Clark. In October, 1921, Clark had sold a relatively small number of the cars last contracted for and had sold some of them at prices lower than the sales price agreed upon with the concerns that had manufactured them. The record shows that he was wholly insolvent.

With his affairs in this condition, Clark became ill and was ordered to a sanitarium. Being confronted with an absence from business for an indefinite period, he instructed his attorney to prepare an "unlimited" power of attorney appointing Hummel, his principal office man, his attorney in fact. He signed the power and went to a sanitarium where during the transaction which followed he was, without doubt, wholly incapable either to transact or be consulted about business matters. Almost immediately Cambria and Westinghouse pressed for settlement of their accounts; unsecured creditors were insistent; promissory notes were maturing; and, by attack from the rear, the New Jersey Company, by formal action, made demand upon Clark for a complete accounting of all his operations under the contract of lease since its date of December 1, 1915 and for payment of moneys found to be due. Clark's credit at the banks had been exhausted and his main assets were tied up in the cars built by Cambria and Westinghouse and held by them as security. In this truly desperate situation Hummel turned for assistance to Clark's attorney and they together sought the aid of Lanahan, the president of the largest unsecured creditor. At a conference in which Lanahan was present, a creditors' committee was proposed but, on the refusal of the secured creditors to co-operate, was abandoned. Clark's attorney next suggested to Hummel that a corporation be organized to take over Clark's assets and assume his obligations with the hope of getting new capital with which to pull the business through. In this suggestion all the office force, including Clark's brother-in-law, concurred. Such a corporation was organized under a Pennsylvania charter presently available and was given the name of Clark Car Company, hereinafter referred to as the Pennsylvania Company. All its officials were Clark's employees. The next step was to induce someone to buy stock. It was obvious that no one would purchase the stock as an investment and only someone vitally interested could be expected to put money into the sinking concern. So, again Lanahan's assistance was sought, it being thought that because the Fort Pitt Company was such a large unsecured creditor, Lanahan might come to the rescue. He did; but the way he did it is the center of this controversy.

After these men had carefully gone over Clark's affairs, it was thought that $50,000 of new money might, with sound judgment, keep the business afloat. Before entering into the transaction Lanahan tried to communicate with Clark but was prevented by the fact that at that critical time Clark was in a state of coma. After negotiations between Hummel, Clark's attorney, and himself, Lanahan agreed to put $50,000 into the new corporation, but insisted upon two things: First, that the money should go not to Clark but to the corporation as live working capital; and second, that he should have in return three-fourths of its capital stock. Finally, this was agreed upon. Clark's property in the car business (not his property otherwise employed) was conveyed to the new corporation; the corporation assumed his contracts and debts; Lanahan put in $50,000 and on receiving three-fourths of its capital stock he was elected president and took charge of its affairs and conducted its business, in the course of which he obligated himself from time to time in sums aggregating $3,000,000; paid the New Jersey Company the dividends and gross profits under the contract of lease between Clark and that company, which, on assignment, the Pennsylvania Company had assumed; and finally paid all its debts and brought it back to solvency. But before the deal was closed, Lanahan went to several persons who were stockholders and directors of the New Jersey Company to obtain their approval of the transaction. From their statements and their action he no doubt thought that that company had ratified the transaction. This it denies. Later, the New Jersey Company brought this suit against the Pennsylvania Company and Lanahan for an accounting, restitution and cancellation, joining as a defendant Clark, who, having recovered from his illness, stands with the New Jersey Company in asserting its demands. Simkins, Federal Equity Suits (3d Ed.) 451.

The relief sought by the plaintiff primarily is the cancellation of the assignment (by Hummel, attorney in fact for Clark, to the Pennsylvania Company) of the so-called con-

tract of lease between the New Jersey Company and Clark; restoration of the property and accounting for its use are matters that follow naturally upon cancellation. From this composite issue five separate questions have arisen:

I. Whether the contract of lease was personal to Clark and, therefore, not assignable;

II. Whether the power of attorney from Clark to Hummel was unlimited, or, being limited to its subject-matter, was too narrow to permit of the transaction that was carried out under its authority;

III. Whether the attorney in fact was, because of Clark's mental incapacity due to illness, legally impotent to act under the power even if not limited;

IV. Fraud;

V. (a) Ratification by Clark; and (b) ratification by the New Jersey Company.

It may be that a consideration of all these questions will not be necessary to a decision, for unless the last one—that of ratification—should be resolved in favor of the Pennsylvania Company and Lanahan, a decision for the New Jersey Company and Clark on any one of the first four would bring the case to an end.

I. Was the contract of lease between the New Jersey Company and Clark, bearing date December 1, 1915, personal to Clark and, therefore, not assignable?

This contract must be interpreted with regard to the relation of the parties which was created and is disclosed by the contract of May 25, 1908 providing for the organization of a corporation to exploit Clark's inventions. That contract recites Clark's ownership of letters patent, applications for letters patent, and designs for patents yet to be applied for pertaining to appliances for the manufacture of railway cars and provides for their sale to the proposed corporation together with all patents thereafter issued to Clark. By this contract the New Jersey Company engaged for all time Clark's inventive faculties and for all time acquired his inventions in this art.

Thus owning Clark's inventions, present and prospective, the New Jersey Company made with Clark the contract of December 1, 1915 here in issue. Being too long to quote, we have already given its substance and shall only refer to its salient parts. The parties—the New Jersey Company and Clark—contracted as individuals, in respect to themselves, not for themselves and their assigns. Their declared intention was the exploitation of Clark's inventions by Clark, the inventor,

the one best knowing their use and value, with an especial regard to their further inventive development. This is evidenced by the tenor of the contract and finally by its limitation to the life of presently owned and prospectively acquired patents. But while the contract specifically embraces patents, it extends as well to the corporation's property of every kind including "drawings, office furniture and equipment."

[1] With this mixture of properties the instrument is somewhat difficult to define legally. Though called a lease and drawn in the characteristic terms of such an instrument it is, of course, not a lease, for it conveys no estate in lands and tenements. It deals solely with personal property, yet even in respect to property of that kind it does not convey title. It leaves the title where it was and gives possession and a right of use to another. In respect to tangible property the instrument has the characteristic of a bailment for hire; in respect to intangible property, such as patents, it closely resembles a license. Whatever its precise legal character, we are clearly of opinion that, in purpose and terms, it is personal to Clark and therefore is not assignable. This conclusion, contingent on the decision of the final question of ratification, it would seem is dispositive of the case; but in view of the gravity of the charges made and the immense amount of work bestowed on the case by court and counsel, we shall briefly review some of the other phases. The next question is:

II. Was the power of attorney from Clark to Hummel unlimited, or, being limited to its subject-matter, was it too narrow to permit of the transaction which was carried out under its authority?

When Clark was ordered to a sanitarium with the certainty that for a time he would be cut off from his business he asked his attorney to draw for him an "unlimited" power of attorney. It is doubtful whether, being a layman, he used that term with its legal signification. However, his attorney drew and Clark signed a power of attorney appointing Hummel his attorney in fact with very broad powers, that is, as we read the instrument, with powers intended to be broad enough to meet the probable exigencies of his affairs. Specific powers were addressed to the conduct of his business. These were the receiving and depositing of money, paying bills, drawing checks and action on his behalf "in any business in which I am now or have been engaged or interested, including the business conducted in the name of the Clark Car Company, and in connection with any

contract or contracts heretofore made by me, including all contracts made in connection with the business of said Clark Car Company." Pursuant to the usual form of such instruments, general powers following the specific powers were given and these were "generally to do and perform all matters and things, transact all business, make, execute and acknowledge all contracts, orders, deeds, writings, assurances and instruments, which may be requisite or proper to effectuate any matter or thing appertaining or belonging to me, and generally to act for me in all matters affecting my business or property."

[2-4] The Pennsylvania Company and Lanahan maintain that by the latter provision, particularly by its included power to make, execute and acknowledge "deeds," the attorney in fact was authorized to assign Clark's contract with the New Jersey Company and sell and convey his car business and properties to the new Pennsylvania Company in consideration of its assumption of his obligations and the delivery to him of one-quarter of its capital stock. We construe the general and specific provisions of the power of attorney in the light of the familiar principle of law that general powers in such instruments are limited by the specific powers therein granted. As we read the writing we gather that the donor intended to give, and did give, his attorney in fact every power incident to the management of his business, even, conceivably, the power to sell and convey property if in the management of his business that should become necessary. But in a power to conduct a business there is no implication of a power to dispose of it and this is particularly true of the instrument under consideration where if any such power can be found it is among the general powers. As these are limited by the specific powers and as the specific powers quite clearly relate not to the ending of the business but to its continuance, we find the power too narrow to authorize the transaction of sale entered into and concluded under its supposed authority. Here again, but for the question of ratification, is an end of the case.

[5] III. The question whether Clark's mental incapacity, amounting at the time to insanity, worked an instant revocation of the power of attorney and rendered his attorney in fact legally impotent to act is moot in view of our finding that the power was limited.

IV. The next question is whether the transaction was vitiated by fraud based on the allegation that Lanahan, a friend of Clark, drove an unconscionable bargain with Clark's agent when Clark was away and helpless and when the agent was coerced into its acceptance by desperate circumstances.

[6] While in the light of our previous findings this question is no longer a decisive one, we advert to it only to make a finding which will have a bearing on our final decision. Whether or not Lanahan made a good bargain for himself in the transaction, it was, without doubt, a most timely and profitable bargain for Clark and the New Jersey Company. Except for it, all the assets of both would have been swept away and nothing would have remained to litigate. We find no fraud on the part of Lanahan or of Hummel.

V. (a) Ratification by Clark; (b) ratification by the New Jersey Company.

[7] (a) True, Clark waited from January to July following the transaction before protesting. During this period we may assume that he gradually regained his mental faculties, yet, concededly, he was still an invalid. He was slow to act but we think not to the extent of waiving his rights and thereby impliedly ratifying what had been done.

[8] (b) The directors of the New Jersey Company ratified the assignment of the lease, conditioned, however, that their interests and Lanahan's should be merged on some basis to be proposed by Lanahan, which proposition was never made and therefore the condition was not performed. The fact of the condition, however, is controverted. But a conditional ratification by directors of a corporation of a sale of its entire business, though the directors be substantial stockholders, is not a ratification by the stockholders and, therefore, does not bind the corporation. We have found nothing in the record indicating a ratification by the stockholders, conditional or otherwise.

Conscious of the risks ever present in analogies, we summarize our conclusions as follows:

During his confinement in a sanitarium, Clark's business craft was rapidly, and very certainly, going on the rocks. She was heavily laden with debts. Among them was a large debt due Lanahan's company. Being moved to save his own property, Lanahan came to her rescue and cast her a line in the form of $50,000 and, himself taking hold and pulling hard, saved her. For this salvage service he claimed and, by previous arrangement with her master, obtained three-quarters of the ship. More than a year later, when lightened of her debts and riding easily in fair weather, Clark (and the New Jersey claimant) seek by this suit to recover the ship and her tackle (except the line that was thrown to her) on the ground that the ship

did not belong to him but was held by him only under charter and, whether or not this was so, the master had no authority to bargain for her salvage.

[9] Having found the lease personal and the power of attorney limited—fatal impediments to the validity of the transaction—and also having found an absence of fraud, we affirm the decree of the District Court when modified by allowing Lanahan, in the accounting, a return of his $50,000 with interest, and in addition a reasonable compensation for his services in bringing the business safely into port; that is (continuing the analogy), an allowance for towage as distinguished from salvage. The item of $50,000 and interest should be allowed him as a general non-preferred debt of the Pennsylvania Company. The item of compensation, however, should be allowed him only after payment of claims of all creditors of the Pennsylvania Company who were strangers to the transaction, yet before payment of any claims against the Pennsylvania Company asserted by Clark, by the New Jersey Company or any of its stockholders, by any person or corporation privy to the transaction, and by anyone, personal or corporate, succeeding to the rights of those named.

In ascertaining the compensation to be allowed Lanahan, any salary which may have been paid him during his management of the corporation and all dividends he received while holding its stock shall enter into the reckoning and be credited as payments—whether in part payment, payment in full or over-payment according as the court shall find.

When so modified the decree of the District Court will be affirmed.

On Application for Modification of Mandate.

PER CURIAM. This application for a modification of the mandate issued in the above-entitled cause was, we surmise, prompted either by the failure of this court adequately to express its judgment or by misunderstanding on the part of the trial court and counsel as to what precisely we decided and what the mandate commanded. Desiring to relieve the learned trial court of embarrassment because of uncertainty as to the meaning of the mandate, as well as to quiet the concern and protect the rights of the parties, we shall recite what has happened and shall endeavor to make clear what was decided.

The mandate follows the decree which embodies by reference the substance of the opinion. The decree appealed from when modi-fied by allowing Lanahan a return of his $50,000 with interest and compensation for -his services was affirmed. Reading the words of the mandate literally, the learned trial court turned to its decree and regarding certain of its paragraphs affirmed because not separately modified directed their performance by the Clark Car Company, the Pennsylvania corporation, and by Lanahan, in these particulars; reconveyance to Clark of the agreement of lease; delivery to Clark of all the capital stock of the Pennsylvania Company; transfer to Clark of all letters patent; surrender to Clark of all drawings, office furniture and equipment; assignment to Clark of all outstanding and uncompleted contracts relating to the manufacture and sale of cars. All those things have been done, and Clark, through the newly acquired ownership of the capital stock, has reorganized and is in full control of the Pennsylvania Company and in possession of all its assets with full power to conduct its business, collect all moneys due, create new obligations, and pay its debts, including what may be due Lanahan. The learned trial court, doubtless intending fully to carry out the modification made by this court in its original decree, next appointed a special master to take and state an accounting of the indebtedness due Lanahan by the Pennsylvania Company. There the court stopped and there the matter stood.

Lanahan, conceiving this disposition of the property in litigation—all of which had been claimed by him and by Clark, respectively, and part of which had been decided to belong to him and part to Clark was not in conformity with the mandate of this court, presented to Judges WOOLLEY, and MORRIS (Judge DAVIS being absent because of illness) a petition for the allowance of an appeal.

The acting judges neither allowed nor denied the application, but, believing that, if there were any infirmity in the mandate as framed or any misconception by the trial court of its meaning, it could otherwise be speedily rectified, suggested on their own motion (and without prejudice to the application for the allowance of an appeal) that counsel bring the matter before them by petition to modify the mandate. That was done. At the hearing there was argument as to the jurisdiction of the court to modify its mandate after the term and some confusion as to whether the case was before the court on rehearing. The court (Judge DAVIS concurring in what has subsequently been done) made it clear that the case was not on rehearing and endeavored to explain precisely

the purport of the opinion and, accordingly, the meaning of the mandate. Though the meaning as expressed by the court is radically different from what the appellees understood it to be, Clark and the New Jersey Company resist any change in the mandate and insist upon its execution in a manner different from what this court intended.

Looking at the matter as of November 11, 1925, the date on which the opinion was filed, this court in reaching its judgment recognized that certain of the property in dispute belonged to Clark and certain of it belonged to Lanahan and that each was entitled to what belonged to him and to nothing more. Further, we realized that these differently owned properties were grouped in and held by the Pennsylvania Company and that they would have to be taken from that company in some form and distributed. How was it to be done? Happily, the record showed that the company was in the hands of receivers appointed by the court in which this litigation was pending and that there was at hand an instrument by which the separation and allocation of these commingled properties could be made with fairness to everyone and without risk to anyone. It did not occur to us, as we think our opinion shows, that the court would allow Lanahan to retain control of the Pennsylvania Company and settle with Clark when and how he chose. And this the court has not done. Nor did we intend that the court should turn over the Pennsylvania Company to Clark and allow Clark to use Lanahan's money as business capital and settle with Lanahan at his convenience. In other words, to restore the status quo ante as nearly as can be, and to that end to conserve the assets, protect strangers to the transaction, preserve the relative priorities of the litigants, and prevent any one of the several parties taking advantage of another, we contemplated the continuance of the receivership and the administration of the Pennsylvania Company by its receivers in such manner and time, not as Clark or Lanahan might decide, but as the court, acting through the receivers, special masters, or otherwise, should determine. With that in view we wrote the controlling words of the opinion as follows:

"Having found the lease personal and the power of attorney limited—fatal impediments to the validity of the transaction—and also having found an absence of fraud, we affirm the decree of the District Court when modified by allowing Lanahan, in the accounting, a return of his $50,000 with interest, and in addition a reasonable compensation for his services in bringing the business safely into port; that is (continuing the analogy), an allowance for towage as distinguished from salvage. The item of $50,000 and interest should be allowed him as a general non-preferred debt of the Pennsylvania Company. The item of compensation, however, should be allowed him only after payment of claims of all creditors of the Pennsylvania Company who were strangers to the transaction, yet before payment of any claims against the Pennsylvania Company asserted by Clark, by the New Jersey Company or any of its stockholders, by any person or corporation privy to the transaction, and by anyone, personal or corporate, succeeding to the rights of these named.

"In ascertaining the compensation to be allowed Lanahan, any salary which may have been paid him during his management of the corporation and all dividends he received while holding its stock shall enter into the reckoning and be credited as payments—whether in part payment, payment in full or over-payment according as the court shall find."

These paragraphs were carefully framed, first to express our judgment as reflected by the opinion at large, and next to leave the learned trial court the latitude which appropriately belongs to it in following and effectuating the mandate. If we thought the paragraphs do not express our judgment, we should, without any hesitation, modify the mandate. Yet, notwithstanding the difference of views which the writing has stimulated, we are of opinion that it expresses the judgment of this court with the meaning we then intended and have now restated. For this reason—and only for this reason—the petition for modification of the mandate is denied.

Let the mandate be returned to the District Court.