Dolores **CLOUSE**

v.

**PHILADELPHIA, BETHLEHEM & NEW ENGLAND RAILROAD COMPANY, et al.**

No. 89–7609.

United States District Court, E.D. Pennsylvania.

Feb. 25, 1992.

Thomas J. Turczyn, Allentown, Pa., for plaintiff.

Michael J. Salmanson, Dechert, Price & Rhoads, Philadelphia, Pa., for defendants.

## MEMORANDUM

DALZELL, District Judge.

■ This case presents an issue of apparent first impression under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Specifically, where an employee benefit plan provides for group life insurance that permits the employee to change the beneficiary, is the exercise of a general power of attorney by the employee's attorney-in-fact effective to change the designation the employee made a few weeks earlier?

### Factual Background

Until his retirement in 1983, Walter C. Clouse, Sr. was an employee of the defendant Philadelphia, Bethlehem & New England Railroad Company ("PBNE"). As an employee, he was entitled to, among other things, life insurance benefits under the employee benefits program PBNE offered.

In the early fall of 1987, Walter, Sr. experienced marital difficulties with his second wife, who was the sister of his deceased first wife. These tensions culminated in the filing of a divorce action in the Lehigh County Court of Common Pleas on or about October 2, 1987. Before filing the divorce complaint, however, Walter, Sr. asked his namesake son to take him to PBNE's personnel office so that the father could change the beneficiary designation on his life insurance from his wife to his four sons.

On September 17, 1987, the two Walters Clouse appeared at PBNE's office and, after discussing the subject with the personnel officer in charge that day, Walter, Sr. executed the change of beneficiary form provided under Metropolitan Life Insurance Company Group Policy 16000G. Under the terms of the PBNE employee benefits plan, the senior Mr. Clouse's designation change was effective immediately.

Later the same day, the two Walters went to a local law office to execute a power of attorney in favor of Walter, Jr. In pertinent part, the power of attorney provided:

## GENERAL POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That I, WALTER C. CLOUSE, SR., do hereby make, constitute and appoint WALTER C. CLOUSE, JR., as my true and lawful attorney, for me and in my name, place and stead, giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in the premises as fully, to all intents and purposes, as I might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that my said attorney or the substitute of our [*sic*] attorney may lawfully do or cause to be done by virtue hereof. My attorney-in-fact shall have the power to authorize medical and surgical procedures. He shall also have the power to authorize my admission to a medical, nursing, residential or similar facility and to enter into agreements for my care. A photocopy hereof shall be deemed an original for all purposes whatsoever.

This Power of Attorney shall not be affected by my disability. It is my wish and intent that the authority conferred by me upon my attorney through this General Power of Attorney should be exercisable notwithstanding my disability, our [*sic*] incapacity, a subsequent disability or incapacity or uncertainty as to whether I was dead or alive. All acts done by my attorney-in-fact or agent during any period of disability or incompetence or uncertainty as to whether I was dead or alive shall have the same effect and shall bind my heirs, legatees, devisees and personal representatives as if I was alive, competent and not disabled.

The same lawyer who drafted this power of attorney filed the divorce complaint on behalf of Mr. Clouse on October 2, 1987. On November 2, 1987, the senior Mr. Clouse suffered a heart attack, as a result of which he lost consciousness, which he never regained before his death on November 8.

On November 4 or 5, during his father's unconsciousness, the younger Walter returned to PBNE's personnel office and stated that he wanted to change the beneficiary designation back to his aunt/stepmother. He told the personnel officer in charge that he had a power of attorney in his favor from his father. The personnel officer refused to change the beneficiary designation because she said the senior Walter had told her that he had executed the power of attorney in the context of the divorce proceedings and that he wanted to keep Mrs. Clouse from receiving his money. This officer also informed the younger Walter that, in her view, his father had expressed his clear desire on the very day that the power of attorney was executed to have his four sons receive the insurance benefits.

The Plan Administrator later confirmed the PBNE personnel officer's decision not to honor Walter, Jr.'s attempted change of beneficiary designation.

Upon the senior Walter's death, Metropolitan Life Insurance Company duly paid the insurance equally to the four sons. Two of the sons, Walter, Jr. and Dennis, turned their share of the insurance proceeds over to their aunt/stepmother. The other two sons, third-party defendants Randy and Gene, believing their father wanted them to have the insurance, refused to turn the funds over to Mrs. Clouse.

This suit ensued,[1] and the defendants have filed a motion for summary judgment. After consideration of the memorandum of law, affidavits and exhibits in support

---

1. ERISA specifically confers jurisdiction over controversies like this one, 29 U.S.C. § 1132(e) and (f).

thereof, and after oral argument, we grant defendants' motion.

*Standard of Review*

■ The first issue we must resolve is what standard of review applies to the Plan Administrator's decision. The Supreme Court canvassed this issue in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), and held that such decisions are to be reviewed under a *de novo* standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115, 109 S.Ct. at 956. In *Bruch*, the Court explained this "unless" by citing with approval this statement in *Nichols v. Eaton*, 91 U.S. 716, 724–725, 23 L.Ed. 254 (1875):

> "[w]hen trustees are in existence, and capable of acting, a court of equity will not interfere to control them in the exercise of a *discretion vested in them by the instrument* under which they act."

489 U.S. at 111, 109 S.Ct. at 954 (emphasis added in *Bruch*).

We thus must first examine the Plan itself to see if such discretion is granted to the Administrator. Section 9.49 of the Summary Plan Description provides in its entirety:

> The Plan Administrator has the responsibility to interpret and construe the provisions of the Plan, to determine eligibility to participate in the Plan, to make and enforce such rules and regulations as the Plan Administrator shall deem necessary and proper for the efficient administration of the Plan, and to decide such questions as may arise in connection with the operation of the Plan.

The Plan Administrator's "responsibility to interpret and construe the provisions of the Plan and to decide such questions as may arise in connection with the operation of the Plan" could be regarded as satisfying the exception *Bruch* permits if it is deemed

tantamount to giving the Administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." While the Plan here indeed gives authority "to determine eligibility" and "to construe the terms of the plan," it does not make that grant of power "discretionary" as *Bruch* requires for us to apply an "arbitrary and capricious" review standard. Given the absence of terms like "discretion", "good faith" or their cognates in § 9.49, it would seem that *Bruch* requires that doubt be resolved in favor of a *de novo* standard of review.[2] Though the *de novo* standard presents an obviously higher threshold for sustaining the Administrator's action, its application here does not affect the result because we hold that even under a *de novo* standard the Administrator's decision was correct as a matter of law.

*The Problem of Restatement, Agency, § 37 and Von Wedel*

■ The black letter law governing general powers of attorney is found in § 37 of the Restatement (Second), Agency, which provides:

> General Expressions and Particularized Authorizations
>
> (1) Unless otherwise agreed, general expressions used in authorizing an agent are limited in application to acts done in connection with the act or business to which the authority primarily relates.
>
> (2) The specific authorization of particular acts tends to show that a more general authority is not intended.

Comment *a* to § 37 explains that:

Powers of attorney are frequently written in such language that their literal interpretation would indicate that the agent is given more power than was intended. See § 34, Comment h. The purpose of the Section is to make clear that, where general terms are used which literally purport to grant great authority,

---

**2.** The Sixth Circuit's decision in *Davis v. Kentucky Finance Companies Retirement Plan*, 887 F.2d 689 (1989), *cert. denied* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990), which defendants press upon us, is not to the contrary. The administrator in *Kentucky Finance* was specifi-

cally given "final and conclusive" authority to resolve questions under the plan. No such language appears in § 9.49 here, and if we were to interpolate it into this text we would effectively read out of the law the distinction *Bruch* was at pains to make. This we decline to do.

such terms will normally be interpreted as authorizing the agent to act only in connection with the business the agent is employed to perform. The more specific the enumeration of acts to be done, the smaller the area to be included in the general statement.

Restatement § 37 was wholeheartedly embraced by the Third Circuit in *von Wedel v. McGrath,* 180 F.2d 716, *cert. denied,* 340 U.S. 816, 71 S.Ct. 45, 95 L.Ed. 600 (1950), stating that it was consistent with the Circuit's earlier decision in *Lanahan v. Clark Car Co.,* 11 F.2d 820, 824 (3d Cir. 1926). *von Wedel* must at a minimum be regarded as the high water mark for the rule that § 37 summarizes.

The plaintiff in *von Wedel* was the American wife of a German national. Her complaint alleged that on July 5, 1939 she and her husband were to leave the United States for a visit to Europe. Prior to leaving, however, Herr von Wedel, "apprehensive that war might break out in Europe prior to their return to this country and that such condition might prevent him coming back to the United States", 180 F.2d at 717, executed a general power of attorney to his friend and lawyer. The complaint also alleged that an "express primary objective of the giving of the power of attorney was to enable the donee to dispose of all or part of the donor's property in the United States by gift to" Mrs. von Wedel. *Id.* The commencement of World War II on September 1, 1939, indeed prevented Herr von Wedel from returning to the United States, and so his friend and lawyer,[3] as attorney-in-fact, transferred to Mrs. von Wedel a great deal of Herr von Wedel's property. The Attorney General of the United States, however, as successor to the Alien Property Custodian, seized the property, and Mrs. von Wedel sued for a decree awarding her the property.

The power of attorney in *von Wedel* gave the attorney-in-fact power "to do any and all acts which I could do if personally present, hereby intending to give him the fullest power and not intending by anything hereinafter contained to limit or cast

down such full power * * *." It also gave specific powers, such as "full power to demand, sue for, recover and receive all manner of goods, chattels," and so forth, and concluded by providing that the attorney-in-fact had "power and authority to do, execute and perform for me and in my name all and singular those things which he shall judge expedient or necessary in and about the premises, as fully as I, * * *, could do if personally present * * *."

Judge McLaughlin wrote, for the panel,

Under the settled law, the specific language governs ... It contains nothing that can be reasonably construed as authority for the attorney in fact to make gifts of von Wedel's property.

180 F.2d at 719. Mrs. von Wedel therefore lost her husband's property to the Attorney General. This holding brought the following concurrence from Judge Goodrich:

I go along with the result because I think it is supported by authority and the subject is not one on which to try to start a revolution. But it seems to me that the whole thing is incongruous. A man has said, in effect, that he gives another the power to do everything for him. Then he enumerates certain specific things which the other may do, carefully saying, however, that he does not mean to alter the general power by stating specific powers. Then he ends up by saying that he means his language to be as broad as he stated it. Yet the rule seems to be that he is held to mean something much less than indicated by the language he used. Perhaps the law cannot quite say that white is black. But in this instance it certainly can make white look a pretty dark grey.

*Id.* Although *von Wedel* might be explained away by the understandable passions World War II aroused, the decision's vitality was recently affirmed in *De Bueno v. Bueno Castro,* 822 F.2d 416, 421 (3d Cir.1987).

---

**3.** And draftsman of the power of attorney.

*Should Restatement § 37 Apply to ERISA–Governed Plans?*

Although it would appear that we have leave "to start a revolution" in this area since this is a case of first impression, we, too, decline to do so even though we are persuaded by Judge Goodrich's remarks in *von Wedel* that Restatement § 37 is counter-intuitive at best and Carrollian at worst.

*Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), requires us to develop a "federal common law of rights and obligations under ERISA-regulated plans", 481 U.S. at 56, 107 S.Ct. at 1558. We therefore look to the purposes of ERISA to decide whether Restatement § 37 is consistent. We hold that it is consistent because ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans", *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983), and fundamental to those interests is the need for clear and unambiguous rules to govern these plans.

The great advantage of applying Restatement § 37 to ERISA-governed plans, however much it may appear to be *Through the Looking–Glass,* is that it is consistent with a well-developed, established body of law. We have found no case that departs from § 37's specific-swallows-the-general rule. Thus, although § 37 may seem aberrant when measured against the standard of common sense and obvious human intentions, "the aberration is an established one.... It is an aberration that has been with us now for half a century, one heretofore deemed fully entitled to the benefit of *stare decisis* ...." *Flood v. Kuhn,* 407 U.S. 258, 282, 92 S.Ct. 2099, 2112, 32 L.Ed.2d 728 (1972).

To depart from § 37 in ERISA-governed cases would require Plan Administrators and courts to indulge in precisely the fact-intensive enterprise plaintiff invites us to embark upon here to find what Walter, Sr.'s true intention would have been. The costs of such intention expeditions necessarily would be borne by the Plan and its beneficiaries. Applying § 37, instead of starting a revolution, may help to keep costs lower. By applying a rule well-known to the insurers of plans, we avoid the inevitable additional costs of applying a rule that would be unique to employee benefit plans. Insurers would doubtless pass on such costs to the plan premium-payers.

In addition, draftsmen of both plans and powers of attorney can take account of the issue raised in this case by (a) specifically mentioning in powers of attorney the authority to change beneficiary designations under employee benefits plans and (b) specifically recognizing the possibility of (a) in the plans themselves. This regime would be on the analogy of what title insurance companies routinely require of powers of attorney at real estate closings. At least in this District, title companies will accept only powers of attorney specific to the subject property. The need for such unambiguous documents also exists for ERISA plans, which cover no less grave subjects for their beneficiaries.

*Conclusion*

We conclude that the power of attorney Walter, Sr. gave his son did not authorize Walter, Jr. to make the beneficiary change he wanted to make to his father's ERISA-governed group life insurance. Given this holding, the Plan Administrator's decision in this case was not only justified, but legally compelled. Defendants' motion for summary judgment will therefore be granted.