[Sac. No. 6581. In Bank. Mar. 22, 1957.]

FARMLAND IRRIGATION COMPANY, INC. (a Corporation), Respondent, v. GEORGE DOPPLMAIER, Appellant.

Wilke, Fleury & Sapunor and Sherman C. Wilke for Appellant.

Theodore H. Lassagne and Naylor & Lassagne for Respondent.

TRAYNOR, J.—Plaintiff in this action seeks a declaratory judgment that it is entitled to manufacture and sell irrigation equipment under a patent license agreement and a declaration of its duties under the royalty provisions of the license agreement.

Darrell C. Mansur invented certain improvements in agricultural sprinkling apparatus. He applied for a patent on his invention, and in the autumn of 1949, while his application was still pending, entered into negotiations with the Stout Irrigation Company, an Oregon corporation (hereinafter referred to as Stout), for the purpose of licensing Stout to manufacture and sell apparatus embodying the invention. Stout was represented in these negotiations by William H. Stout, its president and controlling shareholder, a man of considerable experience in the irrigation equipment business. Mansur, William H. Stout, and defendant Dopplmaier were all present at a demonstration of apparatus embodying the invention held near Fresno in September.

On December 5, 1949, Mansur and Stout entered into the license agreement that is the subject of this action. By this agreement Stout was given the right to make or have made and to sell apparatus embodying Mansur's invention, in return for which it promised to pay Mansur a royalty of three per cent of sums received from licensed sales. Stout was permitted to grant sublicenses on condition that it assume responsibility for the payment of all royalties due on sales by its sublicensees. Mansur retained the right to make and sell apparatus embodying the invention himself and to license others to do so, except that he agreed not to sell to manufacturers or distributors who were in business on December 5, 1949. Improvements in the invention made by either Stout or Mansur could be used by the other during the life of the agreement.

Stout manufactured and sold irrigation apparatus under the license until January 31, 1952. On that date the corporation was dissolved and its assets passed to its shareholders. On February 2, 1952, the shareholders sold the assets, including choses in action, to plaintiff, a California corporation, which proceeded to manufacture and sell under the license. Meanwhile Mansur had obtained his patent and assigned it to defendant together with his rights under the license. First Stout, and later plaintiff, tendered royalties under the license to Mansur and defendant, Mansur's assignee. The first royalty payment was accepted without protest, but defendant rejected later payments on the ground that they were computed on the basis of sums received only from sales of wheel and coupling units, whereas the license called for a royalty based on sums received from sales of the entire irrigation apparatus or any of its parts.

In June, 1951, defendant commenced an action against Stout in the United States District Court for the District of Oregon for an accounting of royalties allegedly due under the license. Plaintiff sought to intervene on the ground that it had bound itself to pay any liability adjudged against Stout, and that its interests were inadequately represented. It also counterclaimed for a declaration of its rights under the license as Stout's successor or assignee. The district court denied the motion to intervene, and its order was later affirmed by the court of appeals on the ground that there was no showing that plaintiff was inadequately represented on the accounting issue, and that the issue made by the counterclaim was not involved in the action. (*Farmland Irr. Co.* v. *Dopplmaier* (9th Cir.), 220 F.2d 247.)

Plaintiff then commenced the present action. A motion

by defendant for a stay of proceedings pending final judgment in the Oregon action was denied. After trial on the merits, the court adjudged that the rights granted Stout under the license were assignable and had been assigned, through the shareholders, to plaintiff, and that under the license plaintiff was bound to pay royalties only on sums received from sales of wheel and coupling units and not on sums received from sales of any other parts of the apparatus. From this judgment defendant appeals.

We are confronted at the threshold with defendant's contention that the trial court abused its discretion in denying his motion for a stay of proceedings. ██ When an action is brought in a court of this state involving the same parties and the same subject matter as an action already pending in a court of another jurisdiction, a stay of the California proceedings is not a matter of right, but within the sound discretion of the trial court. In exercising its discretion the court should consider the importance of discouraging multiple litigation designed solely to harass an adverse party, and of avoiding unseemly conflicts with the courts of other jurisdictions. It should also consider whether the rights of the parties can best be determined by the court of the other jurisdiction because of the nature of the subject matter, the availability of witnesses, or the stage to which the proceedings in the other court have already advanced. (See *Simmons* v. *Superior Court,* 96 Cal.App.2d 119, 123-131 [214 P.2d 844, 19 A.L.R.2d 288]; *Pesquera del Pacifico, S. de R. L.* v. *Superior Court,* 89 Cal.App.2d 738, 740-741 [201 P.2d 553].)

The parties to the present action are not identical with those in the Oregon action. Plaintiff is not a party to the Oregon action; it attempted to intervene as a party defendant, but was successfully prevented from doing so by defendant. Plaintiff brought the present action, not to harass defendant with multiple litigation, but to assert interests it claimed would not be adequately represented in the Oregon action. Defendant contends that nevertheless plaintiff should be compelled to await and be bound by the outcome of the Oregon action. ██ In deciding whether the representation of plaintiff in the Oregon action was an adequate substitute for a present determination of its rights in a California court, the trial court was not bound by the federal court's determination that the representation was adequate to prevent intervention.

■ Moreover, all the issues in the present action are not involved in the Oregon action. (*Cf. Pesquera del Pacifico, S. de R.L.* v. *Superior Court,* 89 Cal.App.2d 738, 741 [201 P.2d 553].) Although the complaint in the Oregon action calls for an adjudication of the licensee's obligations under the royalty provisions, the issue raised by plaintiff's second cause of action in the present case, it does not call for an adjudication of the assignability of the license and plaintiff's rights thereunder, the issues raised by plaintiff's first cause of action. Plaintiff sought to present these issues to the federal court in its counterclaim, but because the motion to intervene was denied, they will not be adjudicated in that court. A stay of the present proceedings would therefore not only bring these issues no closer to determination, but would compel plaintiff to await a judgment that cannot respond to its need. The trial court did not abuse its discretion in denying a stay that would have such an effect.

Defendant contends that the trial court erred in finding that Stout's rights under the license were assignable and had been assigned to plaintiff. Rights under a patent license, defendant argues, are not assignable unless express consent to assignment is contained in the license contract, and in the absence of such consent the contract must be construed as conferring purely personal, nontransferable rights. This rule of construction appears to be set forth in a line of federal cases of which the principal case is *Hapgood* v. *Hewitt,* 119 U.S. 226 [7 S.Ct. 193, 30 L.Ed. 369].

It is contended that because a United States patent is the creature of a federal statute and can be assigned only in the manner provided by federal law, the assignability of rights under a patent license is also a federal question and in the absence of statutory provision is to be determined by the decisional law of the federal courts. This reasoning fails to distinguish patent rights, whose assignability is admittedly governed by a specific statutory provision (35 U.S.C. § 261), and rights created by a contract whose subject is exemption from a patent monopoly. It misconceives the policy of the federal patent statute and the relation between federal and state law in the area of patent rights.

■ Every action that involves, no matter how incidentally, a United States patent is not for that reason governed exclusively by federal law. The police power of the states, for example, has long been held to include reasonable regulation of the manufacture and sale of patented articles dangerous

to public safety (*Patterson* v. *Kentucky*, 97 U.S. 501, 503-509 [24 L.Ed. 1115]), and regulation of the transfer of patent rights to prevent fraud. (*Allen* v. *Riley*, 203 U.S. 347, 355-357 [27 S.Ct. 95, 51 L.Ed. 216].) A patent is not granted without reference to the general powers the states possess over their domestic affairs.

 It has been established by a long line of cases, moreover, that an action to set aside, specifically enforce, or recover royalties on a patent license contract is not an action arising under the patent laws of the United States for the purpose of determining the exclusive jurisdiction of the federal courts. (*Wilson* v. *Sandford*, 10 How. (U.S.) 99, 101 [13 L.Ed. 344]; *Albright* v. *Teas*, 106 U.S. 613, 616-620 [1 S.Ct. 550, 27 L.Ed. 295]; *Dale Tile Mfg. Co.* v. *Hyatt*, 125 U.S. 46, 51-54 [8 S.Ct. 756, 31 L.Ed. 683]; *Pratt* v. *Paris Gas Light & Coke Co.*, 168 U.S. 255, 257-260 [18 S.Ct. 62, 42 L.Ed. 458]; *Excelsior Wooden Pipe Co.* v. *Pacific Bridge Co.*, 185 U.S. 282, 285-287 [22 S.Ct. 681, 46 L.Ed. 910]; *New Marshall Engine Co.* v. *Marshall Engine Co.*, 223 U.S. 473 [32 S.Ct. 238, 56 L.Ed. 513]; *Luckett* v. *Delpark, Inc.*, 270 U.S. 496, 502-511 [46 S.Ct. 397, 70 L.Ed. 703]; *Becher* v. *Contoure Laboratories, Inc.*, 279 U.S. 388, 391 [49 S.Ct. 356, 73 L.Ed. 752]; *Pendleton* v. *Ferguson*, 15 Cal.2d 319, 326-327 [101 P.2d 81, 688].) State courts have jurisdiction over such actions, and in the absence of diversity of citizenship it is exclusive of the federal courts. (See *Henry* v. *A. B. Dick Co.*, 224 U.S. 1, 14-15 [36 S.Ct. 364, 56 L.Ed. 645]; *Dale Tile Mfg. Co.* v. *Hyatt*, 125 U.S. 46, 53 [8 S.Ct. 756, 31 L.Ed. 683].)

 These authorities were concerned with whether a case was one "arising under the patent laws" within the meaning of the federal jurisdictional statutes and the federal policy apportioning business between state and federal courts. Nevertheless, since the jurisdictional test they established was tied to the law that created the cause of action stated in the complaint and made the source of that law its operative fact (see *American Well Works Co.* v. *Layne & Bowler Co.*, 241 U.S. 257, 259-260 [36 S.Ct. 585, 60 L.Ed. 987]; *Albright* v. *Teas*, 106 U.S. 613, 616-618 [1 S.Ct. 550, 27 L.Ed. 295]), in holding that federal jurisdiction did not exist, they necessarily held that the patent statutes did not govern the elements of the plaintiff's case.

Nor were the elements of the plaintiff's case governed by federal decisional law evolved to implement the patent

statutes, for a case founded on such law would have arisen under the patent laws for jurisdictional purposes as much as an action for infringement. As stated in *Wilson* v. *Sanford,* 10 How. (U.S.) 99, 101-102 [13 L.Ed. 344], "the dispute in this case does not arise under any act of Congress; nor does the decision depend upon the construction of any law in relation to patents. It arises out of the contract stated in the bill; and there is no act of Congress providing for or regulating contracts of this kind. The rights of the parties depend altogether upon common law and equity principles." The absence of any elements of distinctively federal law, statutory or decisional, in the plaintiff's case was emphasized by cases holding that, absent a question of the validity or scope of the patent itself, there was no jurisdiction in the United States Supreme Court to review state court decisions on patent licenses. (*Marsh* v. *Nichols, Shepard & Co.,* 140 U.S. 344, 354-357 [11 S.Ct. 798, 35 L.Ed. 413]; *Dale Tile Mfg. Co.* v. *Hyatt,* 125 U.S. 46, 53 [8 S.Ct. 756, 31 L.Ed. 683].)

The plaintiff's cause of action arose under and was governed by the general common law of contracts. If the action was in a federal court, the court applied its view of the common law independent of state court determinations. The question was not posed whether the governing law was specifically state law and whether the law of a particular state should be applied. In this judicial climate, the decisions were rendered that defendant relies on as establishing a federal rule in respect to assignments of licenses. ■ In the light of *Erie R. R.* v. *Tompkins,* 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487], the law governing the elements of the plaintiff's cause of action is state law—state law acting of its own force and not merely by incorporation into federal law. The language of Mr. Justice Holmes in *American Well Works Co.* v. *Layne & Bowler Co.,* 241 U.S. 257, 260 [36 S.Ct. 585, 60 L.Ed. 987], a case involving an action for libel and slander of the plaintiff's title to a machine the defendant claimed infringed his patent, is appropriate: "But whether it is a wrong or not depends upon the law of the State where the act is done, not upon the patent law, and therefore the suit arises under the law of the State. A suit arises under the law that creates the cause of action. . . . The State is master of the whole matter, and if it saw fit to do away with actions of this type altogether, no one, we imagine, would suppose that they still could be maintained under the patent laws of the United States." (See also *Sunnen* v. *Commissioner of*

*Int. Rev.,* (8th Cir.) 161 F.2d 171, 175, rev'd on other grounds, 333 U.S. 591 [68 S.Ct. 715, 92 L.Ed. 898] ; *American Machine & Metals, Inc.* v. *De Bothezat Impeller Co.* (S.D. N.Y.), 82 F.Supp. 556, 558, aff'd (2d Cir.), 180 F.2d 342, 348, cert. denied, 339 U.S. 979 [70 S.Ct. 1025, 94 L.Ed. 1383].)

This conclusion does not, however, completely dispose of the problem. ■ Even if state law governs the basic elements of the plaintiff's case in an action to recover royalties on a license, it does not follow that every issue in the case, including the assignability of the license, is governed by state law. (See *Pratt* v. *Paris Gas Light & Coke Co.,* 168 U.S. 255, 259-260 [18 S.Ct. 62, 42 L.Ed. 458] ; *Albright* v. *Teas,* 106 U.S. 613, 616-618 [1 S.Ct. 550, 27 L.Ed. 295].) If the policy of the patent laws or some other federal statute requires it, state law must of course give way. (*Cf. Scott Paper Co.* v. *Marcalus Mfg. Co.,* 326 U.S. 249, 254-257 [66 S.Ct. 101, 90 L.Ed. 47] ; *Sola Electric Co.* v. *Jefferson Electric Co.,* 317 U.S. 173, 175 [63 S.Ct. 172, 87 L.Ed. 165].) ■ Moreover, the absence of any specific statutory provision governing the issue does not in itself mean that federal law does not control, for if the policy of the federal statute or the implications of the federal system require a uniform rule of decision, the federal courts have paramount power to fashion such a rule. (See *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.,* 315 U.S. 447, 456-458 [62 S.Ct. 676, 86 L.Ed. 956], and see Mr. Justice Jackson concurring at 469-475; Interaction of National and State-Created Interests in Non-Diversity Fields, 47 Columb.L.Rev. 629.)

■ On the other hand, the existence of a line of federal cases establishing a rule of construction on the assignability of licenses is no indication of a federal policy excluding state law. These cases came, for the most part, before *Erie R. R.* v. *Tompkins,* and therefore involved no conscious choice between state and federal law. The federal cases since *Erie R. R.* v. *Tompkins,* do not state what law governs the issue (e. g., *Rock-Ola Mfg. Corp.* v. *Filben Mfg. Co.* (8th Cir.), 168 F.2d 919, 922, cert. denied, 335 U.S. 892 [69 S.Ct. 249, 93 L.Ed. 430] ), and decisions from the state courts have been equally unenlightening on the applicable law. (*Schlesinger* v. *Regenstreif,* 135 N.Y.S.2d 858, 862-863; *Paper Products Machine Co.* v. *Safepack Mills,* 239 Mass. 114 [131 N.E. 288].) ■ The fact that Congress has expressly provided for the assignment of patents themselves (35 U.S.C. § 261), and thereby made some aspects of the validity of such assignments

questions of federal law (see *Crown Die & Tool Co.* v. *Nye Tool & Machine Works,* 261 U.S. 24 [43 S.Ct. 254, 67 L.Ed. 516]; *McClaskey* v. *Harbison-Walker Refractories Co.* (3d Cir.), 138 F.2d 493), also does not show that any federal policy exists to control the assignment of rights under a license. ■■■ Licenses have no statutory basis, and rights under them arise from contract rather than from the fact that patent rights are involved. (See Ellis, Patent Assignments and Licenses 229 (1936).)

■■■ We can find no policy underlying the federal patent statutes that requires a uniform federal rule of construction of license contracts to determine their assignability. ■■■ The purpose in granting a patent monopoly is to promote progress in science and the useful arts by stimulating invention and encouraging disclosure. So long as state law does not destroy the advantages of the monopoly, it respects the federal purpose, and there is no reason why it should not govern, as with any other property, the incidents attached to the ownership of the patent. As was said in *Patterson* v. *Kentucky,* 97 U.S. 501, 508-509 [24 L.Ed. 1115], ''There is no need of giving this power [of monopoly] any broader construction in order to attain the end for which it was granted, which was to reward the beneficent efforts of genius, and to encourage the useful arts.''

■■■ The value of the patent is not affected by subjecting the patentee to state rules of construction on assignability of licenses. Since it is clear that the patentee must in any event look to state law to determine most of his rights under the license, no great inconvenience will be involved in also ascertaining what the state law is on assignability. ■■■ Also, the value of the patent is not significantly affected if the state applies a rule of construction favoring assignability. Such a rule would not hamper the patentee's right to profit from his monopoly by licensing under it.

■■■ It may be that Congress could legislate on this subject and thereby oust state law (see *Allen* v. *Riley,* 203 U.S. 347, 356 [27 S.Ct. 95, 51 L.Ed. 216]), but in the absence of such action we will not postulate a policy we cannot find in the existing federal statutes. If any federal interest exists, it is too remote and speculative to justify displacing state law. (See *Bank of America* v. *Parnell,* 352 U.S. 29 [77 S.Ct. 119, 121, 1 L.Ed.2d 93].) We conclude, therefore, that we are free to make our own determination whether the assignability of a license contract requires express consent in the contract.

 Although the question is one for determination by the law of this state, federal cases are of course persuasive authority because of the experience of the federal courts in the area of patents and patent licenses. The authoritative federal statement that a patent license is not assignable unless made expressly so is contained in *Hapgood* v. *Hewitt*, 119 U.S. 226, 233-234 [7 S.Ct. 193, 30 L.Ed. 369]. The court stated that the license was purely personal and was extinguished with the dissolution of the corporate licensee, although it pointed to no peculiarly personal rights involved. The court relied on the earlier cases of *Troy Iron & Nail Factory* v. *Corning*, 14 How. (U.S.) 193, 216 [14 L.Ed. 383], and *Oliver F. & C. Co.* v. *Rumford Chemical Works*, 109 U.S. 75, 82 [3 S.Ct. 61, 27 L.Ed. 862]. The statement in the Troy case, however, was not necessary to the decision, and in *Oliver F. & C. Co.* v. *Rumford Chemical Works* there were provisions in the license calling for the exercise of the personal skill of the licensee that would have restricted transfer of rights under the license even under ordinary rules of construction. In *Providence Rubber Co.* v. *Goodyear*, 9 Wall. (U.S.) 788, 799 [19 L.Ed. 566], another case before *Hapgood* v. *Hewitt*, the court found the licensee's rights personal and nonassignable only after examining the terms of the instrument and the testimony in the record to ascertain the true meaning and purpose of the contract. (See also *Putnam* v. *Hollender*, (C.C. S.D. N.Y.) 6 F. 882, 890-892.)

Many of the cases since *Hapgood* v. *Hewitt* can be explained on the ground that language in the instrument or the purposes of the contract clearly excluded assignability (e.g., *Rock-Ola Mfg. Corp.* v. *Filben Mfg. Co.*, (8th Cir.) 168 F.2d 919, 922, cert. denied, 335 U.S. 892 [69 S.Ct. 249, 93 L.Ed. 430]; *Reynolds Spring Co.* v. *L. A. Young Industries, Inc.*, (6th Cir.) 101 F.2d 257, 260; *Lanahan* v. *Clark Car Co.*, (3d Cir.) 11 F.2d 820, 823; *Niagara Fire Extinguisher Co.* v. *Hibbard*; (7th Cir.) 179 F. 844, 845 [103 C.C.A. 330]), but nevertheless the rule of *Hapgood* v. *Hewitt* appears to have been consistently adhered to by the federal courts, although without any satisfactory explanation of the reasons underlying it. (See *Lane & Bodley Co.* v. *Locke*, 150 U.S. 193, 195-196 [14 S.Ct. 78, 37 L.Ed. 1049]; *Kenyon* v. *Automatic Instrument Co.* (W. D. Mich.) 63 F.Supp. 591, 593, rev'd on other grounds (6th Cir.), 160 F.2d 878; *Neon Signal Devices, Inc.* v. *Alpha-Claude Neon Corp.* (W.D. Pa.), 54 F.2d 793, 796; *Bowers* v. *Lake Superior Cont. & Dredging Co.* (8th Cir.), 149

F. 983, 986 [79 C.C.A. 493].) The only exception is when the transferee succeeds to the entire business of the licensee, and assumes all its assets and liabilities. (*Lane & Bodley Co.* v. *Locke,* 150 U.S. 193, 196 [14 S.Ct. 78, 37 L.Ed. 1049].)

We are not persuaded that the United States Supreme Court would, in view of the modern tendency in favor of assignability, adhere today to the rule it laid down in *Hapgood* v. *Hewitt*. ▇▇▇ Furthermore, we do not find it necessary or wise to establish a fixed rule, peculiar to patent licenses, that such contracts are not assignable unless made expressly so. There is no reason to exempt these contracts from a general rule adapted to facilitate the freest possible transfer of valuable contract rights, while at the same time respecting the parties' intentions. The federal cases have relied on the flat statement that a license creates a merely personal right. This statement should follow as a conclusion from an examination of the purposes and provisions of the particular license, rather than stand as a self-evident first principle. ▇▇▇ Nothing in the nature of patent licenses makes the rights conferred by them necessarily so personal that the parties must have intended that they be nonassignable.

▇▇▇ The statutes in this state clearly manifest a policy in favor of the free transferability of all types of property, including rights under contracts. (Civ. Code, §§ 954, 1044, 1458.) The terms and purpose of a contract may show however, that it was intended to be nonassignable. ▇▇▇ Thus the duties imposed upon one party may be of such a personal nature that their performance by someone else would in effect deprive the other party of that for which he bargained. The duties in such a situation cannot be delegated. (See *La Rue* v. *Groezinger,* 84 Cal. 281, 283-285 [24 P. 42, 18 Am.St.Rep. 179].) ▇▇▇ Rights likewise cannot be assigned if the assignment would materially impair the nonassigning party's chance of obtaining the performance he expected. (See 2 Williston, Contracts, 1177-1182 (rev. ed. 1936); 1 Rest., Contracts, § 151 (1932).)

Defendant contends that if these principles are applied to the license in the present case, the licensee's rights were not assignable. His argument is that Mansur bargained for William H. Stout's experience in manufacturing and selling irrigation equipment, and intended that rights under the license should be exercised only by a corporation controlled by him; that if these rights may be exercised by another, the

value of defendant's right to receive royalties will be less than was bargained for.

There is no express provision in the contract against assignment. Furthermore, nothing in the contract or the surrounding circumstances shows that rights under it were intended to be nonassignable. As the trial court pointed out, since Mansur did not testify and since apart from the instrument there was no evidence of his intentions, it was the barest speculation to say that personal performance by William H. Stout was an important inducement for him. The provision in the contract permitting the corporation to sublicense shows that Mansur did not intend to restrict enjoyment of rights under the contract to an organization controlled personally by William H. Stout. It is true that at the time the contract was entered into William H. Stout owned a controlling interest in Stout. The contract was made, however, with a corporation, and a corporation by nature may change both in ownership and the agents through whom it acts. If William H. Stout had simply sold his stock in the corporation, defendant could surely not contend that the corporation's rights under the license would be extinguished. Since Mansur dealt with a corporation, if he thought that control of the corporation by a particular person was essential to assure an advantageous return of royalties, he would have provided against the possibility of that person's selling his interest. Mansur's failure to do so is a strong indication that he did not consider personal control by William H. Stout essential. (See *Haldor, Inc.* v. *Beebe*, 72 Cal.App.2d 357, 365 [164 P.2d 568].)

Defendant points to the provision in the contract that if Stout makes any improvements on the invention, Mansur may use them during the life of the contract, and argues that Stout's interest in making such improvements is destroyed by assigning its rights. Stout did not, however, obligate itself to make improvements (see *Fenn* v. *Pickwick Corp.*, 117 Cal. App. 236, 240 [4 P.2d 215]), and, furthermore, if this provision invalidates Stout's assignment to plaintiff, the similar provision that Stout may use Mansur's improvements invalidates Mansur's assignment to defendant. Finally, Mansur was not assured of any definite royalty from Stout, for Stout did not bind itself to produce and sell a certain number of sprinkler systems, and plaintiff as assignee is not bound to sell a certain number. If defendant finds the royalty returns under the license unsatisfactory, under the contract he is free, within limits, to license other producers. The assignment

did not impair materially defendant's chance of obtaining the performance for which Mansur bargained, and therefore it was effective to transfer Stout's rights to plaintiff.

Defendant next contends that the trial court erred in its determination of the method of computing royalties under the license. The license provided that Stout would pay Mansur three per cent of all "sums received from licensed sales." "Sums received from licensed sales" was defined as—sums received by Stout or any sublicensee of Stout hereunder, from sales or leases of apparatus and parts thereof, the manufacture or sale or lease of which apparatus would infringe any patent right of Mansur in a subject invention if this agreement were not in force. . . .

"Subject inventions" was defined as—inventions relating to the adaptation of irrigation pipe lines for movement upon wheels secured to irrigation pipe couplings and provided with a driving means, which inventions are disclosed and claimed in a patent or a pending application now or hereafter filed by or in behalf of Mansur and based upon a sole or joint invention of Mansur, or as to which patent or pending application Mansur has or may acquire any right to grant a license during the existence of this agreement.

Defendant's contention is that these provisions require the payment of a royalty of three per cent of all sums received from the sale of sprinkling systems embodying Mansur's invention, or any part of such systems, even if the invention consists only in the improvement of one part of the apparatus and not in the whole combination. Stout's published price list of the parts it sold includes wheel and coupling units, aluminum pipes, sprinklers, driving devices for rolling the apparatus, hoses, and many other parts that make up an entire sprinkling system. Defendant contends that a royalty is due on sums received from sales of any of these parts for use in a system embodying Mansur's invention, and not, as the trial court held, only on sums received from sales of wheel and coupling units.

The contract is not a model of clarity, but we think it is evident that what Stout was interested in and willing to pay for was the right to use Mansur's invention, that is, the right to use what was new and constituted progress over apparatus already known to the trade. The first paragraphs in the agreement state that Stout desires to manufacture apparatus embodying certain improvements, that these improvements were embodied in apparatus demonstrated to the

parties, and that Mansur is the inventor of these improvements. It seems highly improbable that Stout would agree to pay royalties on parts long known, and which it had until the time of the license sold royalty free. The provision defining sums received from licensed sales provides in effect that a royalty is due on sums received from sales that would, in the absence of the license, infringe Mansur's patent. The computation of royalties is tied directly to the test of infringement, and to the determination of what was in fact Mansur's invention.

Defendant places great emphasis on the phrase: "sums received . . . from sales . . . of apparatus *and parts thereof.* . . ." This phrase does not remove the necessity of determining whether the sale of specific apparatus would in fact infringe the patent; if it would infringe it, then a royalty is due on the sale of that piece of apparatus, or any part of it. It is not a reasonable interpretation of this phrase that it imposes a royalty on the sale of all parts of a sprinkling system if the sale of any one part would infringe the patent.

It becomes necessary, therefore, in order to determine what sales would "infringe any patent right of Mansur in a subject invention," to know what Mansur invented, and the extent to which he advanced over prior art.

Mansur's claims describe an apparatus in which sections of pipe are arranged end to end, each section of pipe joined to the next one by a coupling. The coupling is secured to the end of one section of pipe, and the end of the abutting section of pipe is then inserted into the coupling through an opening considerably larger than the diameter of the pipe so inserted, and also through a flexible, water-tight seal inside the coupling. Because of the size of the opening and the flexibility of the water-tight seal, the sections of pipe so coupled can assume angles relative to each other. Furthermore, a collar mounted on the inserted pipe section carries two projecting arms that fit between ribs on the outside of the coupling. These arms do not interfere with the pipe sections' assuming angles relative to each other, but assure that rotational force applied to one pipe section will be transmitted through the coupling to a connected pipe section, and then to the whole series of connected pipe sections. A wheel is mounted on each coupling; since the wheel is rigidly mounted and uses the sleeve of the coupling and the pipe as its hub, rotation of the pipe causes rotation of the wheel. Thus an entire line of pipes can be rolled from place to place

with little effort, and without regard to unevenness in the terrain. Water is pumped into one end of the line of pipes and discharged through sprinklers set in the tops of the pipe sections onto the crops to be irrigated.

As early as 1868, Abbott (British Patent No. 3,416) invented a sprinkling apparatus composed of a series of connected perforated tubes mounted on wheels. The wheels, however, were not rigidly mounted on the tubes, but instead used them as axles, so that the tubes did not themselves rotate, and there was no need to transmit rotational force from one tube to the next. Meyer went a step further. (British Patent No. 157,727 (1921).) He patented an apparatus in which wheels were mounted rigidly on connected pipes, so that rotation of the pipes caused rotation of the wheels, and, because the sections of pipe were rigidly coupled, rotational force applied to any one section of pipe was transmitted to all. It does not appear, however, that the coupling between the pipe sections permitted them to assume angles relative to each other. Iverson's apparatus (United States Patent No. 1,373,660 (1921)) was similar to Meyer's, and like it made no provision for a coupling that would permit pipe sections to assume angles relative to each other. Lanninger's apparatus (German Patent No. 425,774 (1924)) did include a coupling that permitted the pipe sections to assume angles relative to each other, so that a line of pipe sections could roll easily over uneven terrain, but because the pipes did not rotate with the wheels, no provision was made for transmitting rotational force through the couplings.

An examination of these earlier patents shows that for some time before Mansur's invention, irrigation pipes had been equipped with sprinklers, coupled together, and mounted on wheels. Moreover, couplings had been devised that permitted the pipe sections to assume angles relative to each other, and other couplings had been devised that transmitted rotational force from one pipe section to all others. It remained for Mansur to invent a coupling that performed both these functions, and in this innovation, rather than in any combination of coupled pipes mounted on wheels, he advanced over prior art. Agren (United States Patent No. 2,148,975 (1939)) had also devised a coupling that transmitted rotational force and yet permitted connected shafts to move out of straight alignment, but the coupling was not adapted for irrigation purposes and was significantly different in design from Mansur's.

Improvement in one element of a combination, although in a sense it makes the combination a new thing, does not produce a patentable combination. For the combination to be a patentable invention, it must perform a new and different function, and it is not enough that the improvement merely increases the efficiency or convenience of the old combination. (*General Motors Corp.* v. *Estate Stove Co.* (6th Cir.), 203 F.2d 912, 917, cert. denied, 346 U.S. 822 [74 S.Ct. 37, 98 L.Ed. 348].) Since Mansur's only invention consisted in an improved coupling, and since this coupling is included only in the wheel and coupling units sold by plaintiff, all other parts on the published price list can be sold without infringing Mansur's patent. The trial court was correct in concluding that plaintiff was bound to pay royalties only on sums received from sales of wheel and coupling units.

Defendant's final contention is that the court committed errors in admitting certain evidence. We need not consider the assignments of error concerning the admission of evidence to show that plaintiff is the successor in business of Stout. Since we have concluded that plaintiff took its rights under the license by assignment, it is unnecessary to decide whether it also took as a successor to Stout.

Defendant contends that it was error to permit William H. Stout to testify that before entering into the contract he had asked counsel to make a search to determine if mounting pipes on wheels was patentable and that counsel had reported the existence of the Iverson patent. Defendant claims that this testimony was immaterial, hearsay, and opinion evidence. The evidence was relevant and competent to show that at the time of the execution of the contract William H. Stout probably knew that mounting pipes on wheels was not new and thereby to show his understanding of the nature of Mansur's invention and the meaning of the royalty provisions. Defendant did not request that the probative force of the evidence be confined to this issue and cannot now complain that other inferences could possibly be drawn from it.

William H. Stout was also allowed, over defendant's objection, to testify that certain features of Mansur's apparatus had been used by Stout for some years in other apparatus. There was no error here. Stout was admittedly familiar with irrigation equipment, in particular with his own firm's equipment, and he was in a position to testify as to what features of Mansur's apparatus had been used before Mansur applied

for a patent. He did not give an opinion on what part of Mansur's apparatus was new art, the ultimate question of law, and his testimony was proper in aid of the court's determination of this issue. (See *Smith* v. *Thompson* (S.D. Cal.), 43 F. Supp. 848, 849.)

Judgment affirmed.

Gibson, C. J., Shenk, J., Carter, J., Schauer, J., Spence, J., and McComb, J., concurred.