In re: CFLC, INC., a Delaware corporation, formerly known as Everex Systems, Inc., a Delaware corporation, Debtor.

EVEREX SYSTEMS, INC., a California corporation formerly known as Yside, Incorporated, Appellant,

v.

CADTRAK CORPORATION, Appellee.

No. 94–16960.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 16, 1996.

Decided July 16, 1996.

Patrick M. Costello, and Mark A. Wayne, Murray & Murray, Palo Alto, California, for appellant Everex Systems, Inc.

K. John Shaffer, Stutman, Treister & Glatt, Los Angeles, California, for appellee Cadtrak Corporation.

Before: SNEED, PREGERSON, and KLEINFELD, Circuit Judges.

PREGERSON, Circuit Judge:

Everex Systems, Inc., a buyer of certain of the assets of CFLC, Inc. in a Chapter 11 bankruptcy, appeals the district court's affirmance of a bankruptcy court order denying CFLC's motion as debtor to assume and assign to Everex a patent license from Cadtrak Corporation to CFLC.[1] We have jurisdiction under 28 U.S.C. § 158(d) and affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In a 1986 agreement, as modified by a 1989 supplemental agreement, Cadtrak, in return for a one-time $290,000 payment, granted CFLC, a personal computer company, a royalty-free, worldwide, nonexclusive license to use certain computer graphics technology for which Cadtrak holds a patent (the "Cadtrak license"). The license agreement specified, among other things, that the license was non-transferrable, that it extended to any company more than 50% of which was owned by CFLC, that it conferred on CFLC no right

---

1. Before the bankruptcy proceedings, CFLC was known as Everex Systems, Inc., and the company now known as Everex Systems, Inc. was known as Yside Corporation. For the sake of simplicity and consistency, the two firms are referred to as "CFLC" and "Everex", respectively, throughout this opinion, regardless of the name used at the time of the events described.

to sublicense, that it could be terminated by Cadtrak upon CFLC's bankruptcy, and that it was to be construed according to California law.

On January 4, 1993, CFLC began a Chapter 11 proceeding, in the course of which it sold certain divisions, foreign subsidiaries, and assets for nearly $20 million. It then sought and received approval to sell "substantially all" of its remaining assets to Everex. The sale closed on November 12, 1993; Everex paid approximately $4 million.

The sale agreement provided that the parties would seek the assumption and assignment by CFLC to Everex of certain designated executory contracts, and for the designation up to 30 days after the closing date of additional contracts to be assumed and assigned; Everex acknowledged that the bankruptcy court had the final decision on the assumption and assignment of the contracts. On December 8, 1993, Everex designated additional contracts, including the Cadtrak license. On January 4, 1994, CFLC moved to assume and assign executory contracts, including the Cadtrak license; Cadtrak objected to the assumption and assignment. Bankruptcy Judge Randall J. Newsome held a hearing on the motion on February 4 and orally denied the motion as to the Cadtrak license; a written order followed.

Everex and CFLC appealed to the District Court, where Judge Wilken heard oral argument in September 1994 and affirmed the bankruptcy court's denial in a written order on October 4, 1994, published as *In re CFLC, Inc.*, 174 B.R. 119 (N.D.Cal.1994).

## STANDARD OF REVIEW

We review a district court's decision on an appeal from a bankruptcy court *de novo*. *Federal Deposit Insurance Corp. v. Daily (In re Daily)*, 47 F.3d 365, 367 (9th Cir.1995). We review a bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*. *Robertson v. Peters (In re Weisman)*, 5 F.3d 417, 419 (9th Cir. 1993).

## DISCUSSION

### Standing to Appeal

Cadtrak argues that Everex lacks standing to pursue this appeal. Although the Bankruptcy Code is silent on the question of appellate standing, this court has held that the "person aggrieved" test, derived from the Bankruptcy Act of 1898, governs appellate standing under the code. *Fondiller v. Robertson (In re Fondiller)*, 707 F.2d 441, 442–43 (9th Cir.1983). That test limits appellate standing to "those persons who are directly and adversely affected pecuniarily by an order of the bankruptcy court". *Id.* at 442. Cadtrak argues that since CFLC, the debtor, has not appealed from the district court decision, this court lacks jurisdiction because Everex does not meet the "person aggrieved" test. *See Tilley v. Vucurevich (In re Pecan Groves of Arizona)*, 951 F.2d 242, 245 (9th Cir.1991) ("Where the original party to a lawsuit decides not to appeal ..., the intervenor must have independent standing to appeal.").

Cadtrak argues that Everex is merely an unsuccessful bidder at a bankruptcy sale, a category of persons that several cases have held not to be "aggrieved" for standing purposes. *See, e.g., G–K Development Co. v. Broadmoor Place Investments, L.P. (In re Broadmoor Place Investments, L.P.)*, 994 F.2d 744, 746 n. 2 (10th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 877, 127 L.Ed.2d 73 (1994); *Davis v. Seidler (In re HST Gathering Co.)*, 125 B.R. 466 (W.D.Tex. 1991); *Big Shanty Land Corp. v. Comer Properties, Inc.*, 61 B.R. 272 (N.D.Ga.1985).

These cases do not deprive Everex of standing. They generally involve a suit by one prospective purchaser of a debtor's asset who has lost out to another purchaser and therefore has not been able to purchase *any* of the debtor's assets. None of the cases denying appellate standing to a disappointed bidder for a debtor's asset suggests that an actual successful buyer of a substantial portion of a debtor's assets—in this case allegedly substantially all of the assets of the debtor's core business—lacks standing. The purchase agreement between Everex and CFLC, approved by the bankruptcy court, specifically included in the description of the

purchased assets "[a]ll of [CFLC]'s interest in intellectual property rights, including ... patents, ... that may be assigned by [CFLC]", and specifically granted Everex the right to designate contracts that CFLC would use its best efforts to have assigned to Everex. Everex is clearly adversely and directly affected pecuniarily by the bankruptcy court's order denying the motion to assume and assign the Cadtrak license. Cadtrak's attempt to have the court deny standing by treating Everex as a disappointed bidder for the Cadtrak license—in complete isolation from its successful purchase of a significant portion of CFLC's assets—is unpersuasive.

### Assumption & Assignment of Executory Contracts in Bankruptcy

Section 365 of the Bankruptcy Code "gives a trustee in bankruptcy the authority either to reject or to assume executory contracts and unexpired leases. Ordinarily, a trustee may take either of these actions without the consent of the other party to the contract or lease and notwithstanding a provision in the applicable agreement that purports to restrict assignment. See 11 U.S.C. §§ 365(a) & (f)(1)." *Metropolitan Airports Commission v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.),* 6 F.3d 492, 494 (7th Cir.1993). Once a contract has been assumed, the trustee can assign it.[2] 11 U.S.C. § 365(f). "The trustee's power, however, is not absolute", *id.,* and both § 365(a), which authorizes assumption, and § 365(f), which authorizes assignment, are *expressly* subject to an exception provided in § 365(c):

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or

lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

> (B) such party does not consent to such assumption or assignment ...

The parties agree that if the exception of 365(c) applies to the Cadtrak license, the bankruptcy court was correct in denying the motion to assume and assign that license.

At least two circuits have offered apparently differing views on the scope of § 365(c); on the interplay between § 365(f), which authorizes the assignment of assumed contracts, and § 365(c), to which the former section is expressly subject; and on the use of the phrase "applicable law" in both subsections. *Compare In re Pioneer Ford Sales, Inc.,* 729 F.2d 27, 29 (1st Cir.1984) (Breyer, J.) ("[W]e see no conflict, for (c)(1)(A) refers to state laws that prohibit assignment 'whether or not' the contract is silent, while (f)(1) contains no such limitation. Apparently (f)(1) includes state laws that prohibit assignment only when the contract is *not* silent about assignment; that is to say, state laws that enforce contract provisions prohibiting assignment. These state laws are to be ignored. The section specifically excepts (c)(1)(A)'s state laws that forbid assignment even when the contract *is* silent; they are to be heeded.") (citations omitted) *with Rieser v. Dayton Country Club Co. (In re Magness),* 972 F.2d 689, 695 (6th Cir.1992) ("There is simply nothing in the language of § 365(f) which supports the limitation read into it by [the *Pioneer Ford* ] court ... Neither *Pioneer Ford* nor any other decision to date provides a defensible explication of the parameters of the § 365(c) exception."). *See also Ford Motor Co. v. Claremont Acquisi-*

---

**2.** Although it is technically more accurate to speak of the assignment of a party's rights under a contract and the delegation of a party's duties, this opinion follows the more common use of the term "assign" as encompassing both the assignment of rights and the delegation of duties.

An additional complexity of terminology in the discussion of the issues involved in this appeal is the potential confusion over the difference among a patent assignment, a patent license, and

an assignment of a patent license. An assignment of a patent is a transfer of an ownership interest in the patent and is specifically authorized and regulated by 35 U.S.C. § 261. A license is an agreement allowing the licensee to use the patent but not transferring any ownership interest in the patent. An *assignment of a patent license* is a transfer of the rights granted in the license.

tion Corp. (In re Claremont Acquisition Corp.), 186 B.R. 977, 980–984 (C.D.Cal.1995) (discussing in detail the conflict and evaluating the two main positions). Because, as we hold below, a nonexclusive patent license is personal and nondelegable under federal law, § 365(c) bars the assumption and assignment of the license in this case under either test and we need not attempt to resolve whatever conflict exists between the two decisions.

### Is the License an Executory Contract?

■ Everex argues that no meaningful performance remains on either side of the contract. If it were right on this point, Everex would lose the appeal since § 365 only allows the assumption and assignment of executory contracts. However, Everex is clearly wrong. This court has held that the meaning of that term in this context is "a contract ... on which performance is due to some extent on both sides" and in which "the obligations of both parties are so far unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other". *Griffel v. Murphy (In re Wegner)*, 839 F.2d 533, 536 (9th Cir.1988) (citations omitted). Cadtrak owes significant continued performance to the licensee: it must continue to refrain from suing it for infringement, since a nonexclusive patent license is, in essence "a mere waiver of the right to sue" the licensee for infringement. *De Forest Radio Telephone Co. v. United States*, 273 U.S. 236, 242, 47 S.Ct. 366, 367–68, 71 L.Ed. 625 (1927) (quoting *Robinson on Patents* §§ 806, 808). The licensee also owes performance: it must mark all products made under the license with proper statutory patent notice. Since failure to mark deprives the patent holder of damages in an infringement action before the infringer has actual notice of the infringement, 35 U.S.C. § 287, the licensee's performance of this duty is material. Therefore, the license is an executory contract under § 365.

### Does Federal or State Law Apply?

■ Whether 365(c) bars assumption and assignment of the Cadtrak license thus turns on whether or not "applicable" law excuses Cadtrak from accepting performance from, or rendering performance to, anyone other than CFLC. The bankruptcy and district courts held that the applicable law is federal law, and that federal common law makes patent licenses nonassignable. Everex argues that the applicable law is California law, and that the California Supreme Court's opinion in *Farmland Irrigation Co. v. Dopplmaier*, 48 Cal.2d 208, 308 P.2d 732 (1957), does not bar the assignment of rights, or delegation of duties, under patent licenses.

■ The statutes governing patents are basically silent on the issue of licenses.[3] The construction of a patent license is generally a matter of state contract law, *Lear, Inc. v. Adkins*, 395 U.S. 653, 661–62, 89 S.Ct. 1902, 1906–07, 23 L.Ed.2d 610 (1969) ("[T]he California Supreme Court's construction of the 1955 licensing agreement is solely a matter of state law."), except where state law "would be inconsistent with the aims of federal patent policy", *id.* at 673, 89 S.Ct. at 1912–13. *See also McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed.Cir.1995) ("Whether express or implied, a license is a contract 'governed by ordinary principles of state contract law.' "); *Power Lift, Inc. v. Weatherford Nipple–Up Systems, Inc.*, 871 F.2d 1082, 1085–86 (Fed.Cir.1989) (holding that "license agreement is a contract governed by ordinary principles of state contract law" and examining whether state relief from forfeiture provision was preempted). Two circuits have found such an inconsistency and expressly held that "[q]uestions with respect to the assignability of a patent license are controlled by federal law". *PPG Industries, Inc. v. Guardian Industries Corp.*, 597 F.2d 1090, 1093 (6th Cir.), *cert. denied*, 444 U.S. 930, 100 S.Ct. 272, 62 L.Ed.2d 187 (1979); *Unarco Industries, Inc. v. Kelley Co.*, 465 F.2d 1303, 1306 (7th Cir.1972) ("[T]he ques-

---

**3.** 35 U.S.C. § 261 provides that patents "shall have the attributes of personal property". The statute does speak to the question of assignments of patents (as opposed to licenses): "patents, or any interest therein, shall be assignable", and a

patentee "may ... grant and convey an exclusive right under his ... patents[ ] to the whole or any specified part of the United States". 35 U.S.C. § 261.

tion of assignability of a patent license is a specific policy of federal patent law dealing with federal patent law. Therefore, we hold federal law applies to the question of the assignability of the patent license in question."), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973). *See also In re Alltech Plastics, Inc.,* 71 B.R. 686, 689 (W.D.Tenn.1987) ("The right[ ] of the patent owner to license the use of his invention is a creature of federal common law as is the right of the licensee to have the license construed . . . [I]t follows that questions regarding the assignability of patent licenses are controlled by federal law.").

Everex argues that these holdings are incorrect in applying federal law.[4] It begins from the premise that "[t]here is no federal general common law". *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Since the federal patent laws are silent on the question of licenses and their assignability, a federal rule of decision on assignability is possible only if this is an area "in which judicial creation of a special federal rule would be justified". *O'Melveny & Myers v. Federal Deposit Insurance Corp.,* —— U.S. ——, ——, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994). Everex notes that such areas are "few and restricted", *Wheeldin v. Wheeler,* 373 U.S. 647, 651, 83 S.Ct. 1441, 1444–45, 10 L.Ed.2d 605, and "limited to situations where there is a 'significant conflict between some federal policy or interest and the use of state law' ", *O'Melveny,* —— U.S. at ——, 114 S.Ct. at 2055 (quoting *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)), and challenges whether the cases holding that federal law governs patent-license assignability meet these criteria.

*Unarco* expressly considered the issue of whether, in a post-*Erie* world, federal or state law governs the assignability of patent licenses and advanced two reasons for applying federal law.[5] First, it quoted from *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942), in which the Supreme Court held that federal law preempted any state law which would estop a patent licensee from challenging a provision of the license as a violation of the Sherman Act. *Unarco* quoted the *Sola* Court's view that *Erie* does not apply

"to those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law ... To the federal statute and policy, conflicting state law and policy must yield."

*Unarco,* 465 F.2d at 1306 (quoting *Sola,* 317 U.S. at 176, 63 S.Ct. at 173–74) (citations omitted) (ellipsis in original). Everex argues, with some justification, that *Sola* found that federal law governed in that case because of federal antitrust, rather than patent, policy, which suggests that *Sola* applied federal law to that particular question of licensee estoppel because of the sweep of federal antitrust policy, not federal patent policy. Indeed, in a later opinion overruling the entire doctrine of patent licensee estoppel, the Supreme Court described *Sola* as having created an "anti-trust exception" to the doctrine. *Lear,* 395 U.S. at 666, 89 S.Ct. at 1909.

The second ground offered by *Unarco* in support of applying federal law to the question of assignability of a patent license is also

---

**4.** Much of the argument is based on Justice Traynor's opinion for the California Supreme Court in *Dopplmaier.* Based on well-established law that a suit to enforce a patent license does not arise under the patent laws so as to confer exclusive jurisdiction on federal courts, Justice Traynor concluded that, under *Erie,* state law governed patent licenses. He acknowledged that on any particular question, state law would have to give way if federal policy—embodied either in statute or federal common law—required. He then considered the federal cases holding that patent licenses are not assignable—some decided before *Erie* and the others not addressing the question of which law governs—and could dis-

cover no federal "policy underlying the federal patent statutes that requires a uniform, federal rule of construction of license contracts to determine their assignability." 308 P.2d at 737–39.

**5.** *PPG Industries* offers no explanation for its choice of federal law beyond citing to *Unarco.* It does explain the *content* of federal law on the question—that a license is personal and nonassignable—by reference to a nineteenth-century Supreme Court case, *Troy Iron & Nail Factory v. Corning,* 55 U.S. (14 How.) 193, 14 L.Ed. 383 (1852).

less firm than might be wished. The court noted that a patentee's act in licensing the patent is a use of a monopoly authorized by the Constitution and enacted by Congress. "This monopoly conferred by federal statute as well as the policy perpetuating this monopoly, so affects the licensing of patents, and the policy behind such licensing is so intertwined with the sweep of federal statutes, that *any* question with respect thereto must be governed by federal law." *Unarco*, 465 F.2d at 1306 (emphasis added). This conclusion seems insupportably broad given the general rule that most questions with respect to the construction of patent licenses are governed by state law.

 Federal patent policy, however, does justify the application of federal law here. The fundamental policy of the patent system is to "encourag[e] the creation and disclosure of new, useful, and non-obvious advances in technology and design" by granting the inventor the reward of "the exclusive right to practice the invention for a period of years". *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150–51, 109 S.Ct. 971, 977–78, 103 L.Ed.2d 118 (1989). Allowing free assignability—or, more accurately, allowing states to allow free assignability—of nonexclusive patent licenses would undermine the reward that encourages invention because a party seeking to use the patented invention could either seek a license from the patent holder *or* seek an assignment of an existing patent license from a licensee. In essence, every licensee would become a potential competitor with the licensor-patent holder in the market for licenses under the patents. And while the patent holder could presumably control the absolute *number* of licenses in existence under a free-assignability regime, it would lose the very important ability to control the *identity* of its licensees. Thus, any license a patent holder granted—even to the smallest firm in the product market most remote from its own—would be fraught with the danger that the licensee would assign it to the patent holder's most serious competitor, a party whom the patent holder itself might be absolutely unwilling to license. As a practical matter, free assignability of patent licenses might spell the end to paid-up licenses such as the one involved in this case. Few patent holders would be willing to grant a license in return for a one-time lump-sum payment, rather than for per-use royalties, if the license could be assigned to a completely different company which might make far greater use of the patented invention than could the original licensee.

Thus, federal law governs the assignability of patent licenses because of the conflict between federal patent policy and state laws, such as California's, that would allow assignability.

### Does Federal Law Bar Assignment of Nonexclusive Patent Licenses?

 Federal law holds a nonexclusive patent license to be personal and nonassignable and therefore would excuse Cadtrak from accepting performance from, or rendering it to, anyone other than CFLC. "It is well settled that a non-exclusive licensee of a patent has only a personal and not a property interest in the patent and that this personal right cannot be assigned unless the patent owner authorizes the assignment or the license itself permits assignment." *Gilson v. Republic of Ireland*, 787 F.2d 655, 658 (D.C.Cir.1986) (Friedman, J.). *See also Stenograph Corp. v. Fulkerson*, 972 F.2d 726, 729 n. 2 (7th Cir.1992) ("Patent licenses are *not* assignable in the absence of express language."); *PPG Industries*, 597 F.2d at 1093 ("It has long been held by federal courts that agreements granting patent licenses are personal and not assignable unless expressly made so."); *Unarco*, 465 F.2d at 1306 ("The long standing federal rule of law with respect to the assignability of patent license agreement provides that these agreements are personal to the licensee and not assignable unless expressly made so in the agreement."); *Rock–Ola Manufacturing Corp. v. Filben Manufacturing Co.*, 168 F.2d 919, 922 (8th Cir.), *cert. dismissed*, 335 U.S. 855–6, 69 S.Ct. 134, 93 L.Ed. 403 (1948); *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del.1985) (rights conveyed by nonexclusive patent license are personal to licensee and not susceptible to sublicensing unless specific permission given). The only decision cited to the contrary is Justice Traynor's opinion in *Dopplmaier*. While that opinion raises not insignificant questions about the actual holdings, relevance, and continued vitality of the nineteenth-century Su-

preme Court decisions which are cited for the origins of the federal rule, *Troy Iron & Nail Factory v. Corning,* 55 U.S. (14 How.) 193, 14 L.Ed. 383 (1852), *Oliver v. Rumford Chemical Works,* 109 U.S. 75, 3 S.Ct. 61, 27 L.Ed. 862 (1883), and *Hapgood v. Hewitt,* 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369 (1886), those questions are not so significant as to compel departure from the uniform rule of modern federal decisions reading those precedents as defining nonexclusive patent licenses as personal and non-assignable.

## CONCLUSION

Because federal law governs the assignability of nonexclusive patent licenses, and because federal law makes such licenses personal and assignable only with the consent of the licensor, the Cadtrak license is not assumable and assignable in bankruptcy under 11 U.S.C. § 365(c). The decision of the district court is therefore **AFFIRMED**.

KLEINFELD, Circuit Judge, concurs in the result.